**United States District Court**
For the Northern District of California

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) Case No. 3:14-cv-00780 |
| | ) |
| Plaintiff, | ) ORDER DENYING MOTIONS FOR |
| | ) <u>SUMMARY JUDGMENT</u> |
| v. | ) |
| | ) |
| $209,815 IN UNITED STATES | ) |
| CURRENCY, | ) |
| | ) |
| Defendant. | ) |
| ———————————————————— | ) |
| | ) |
| | ) |
| JULIO FIGUEROA, | ) |
| | ) |
| Claimant. | ) |
| ———————————————————— | ) |

I.    **INTRODUCTION**

Now before the Court are a motion by Julio Figueroa ("Claimant") for summary judgment and a cross-motion by Plaintiff United States ("the Government") for summary judgment. ECF Nos. 104 ("Mot."), 115 ("Opp'n and Cross Mot." or "OACM"). The motions are fully briefed[1] and appropriate for consideration without oral argument under Civil Local Rule 7-1(b). For the reasons set forth below, the Court now DENIES both motions.

---

[1] ECF Nos. 116 ("Reply and Cross Opp'n" or "RACO"); 126 ("Cross Reply"); 133 ("Surreply"); 139 ("Response").

**United States District Court**
For the Northern District of California

## II.   **BACKGROUND**

The facts of this case are well known to the parties, and are set forth in the Order of the Court dated December 8, 2014, ECF No. 87 ("SJ Order").  Additional procedural history is found in the Order of the Court dated April 28, 2015, ECF No. 103.  The Court adopts the background sections thereof in their entirety and incorporates them as though set forth herein.

By way of summary, on September 27, 2013, Julio Figueroa ("Claimant") flew one way from John F. Kennedy Airport (JFK) to San Francisco Airport (SFO).  Upon arrival, Claimant collected two checked bags, and was stopped by law enforcement after collecting his bags but before he left SFO.  In the encounter that followed (which the Court has previously determined was voluntary, consensual, and did not constitute a seizure under the Fourth Amendment), Claimant permitted the search of his two bags, each of which contained a backpack which in turn contained a combined total of 13,644 bills in primarily small denominations ($5, $10, and $20) with an aggregate value of $209,815.  This currency ("Defendant") was seized by the United States in the belief it was connected to drug trafficking, and later caused a narcotics detection canine (or "drug dog") to alert to their presence.  The seizure occurred at approximately 12:33 p.m., and the funds were deposited into an account at Bank of America approximately one hour later at 1:30 p.m. the same day.  Compl. ¶¶ 15, 18; RACO at 6 (citing ECF No. 51-1 at 6).

Procedurally, the Court has previously been asked to consider summary judgment on the grounds involved in the instant motion.  In relevant part, the Court stated:

**United States District Court**
For the Northern District of California

The remainder of the Government's motion seeks summary judgment on the question of whether the Currency is subject to forfeiture and on Figueroa's affirmative defenses.   Under 21 U.S.C. Section 881(a)(6), seized currency is subject to forfeiture if (1) it is intended to be furnished in exchange for controlled substances, (2) it is proceeds "traceable" to such exchanges, or (3) it is otherwise used or meant to be used to facilitate violation of the Controlled Substances Act.   Here, the Government argues the currency is either the proceeds of illegal drug sales or is traceable to such sales.   As a result, the Government must show a connection between the Currency and illegal drug trafficking by a preponderance of the evidence.   18 U.S.C. § 983(c)(1); United States v. $493,850, 518 F.3d 1159, 1170 (9th Cir. 2008).

The problem with this motion is that it is premature . . .   Here, part of the basis for forfeitability is the alert of the drug dog, Jackson.   As other cases have recognized, the records of a drug-sniffing dog and the testimony of the dog's handler are relevant to the reliability of the dog's alert.   See, e.g., Florida v. Harris, 133 S. Ct. 1050, 1057-58 (2013); United States v. $10,700, 258 F.3d 215, 230 & n.10 (3d Cir. 2001).   Similarly, Figueroa disputes large portions of the Agents' description of events.   At a minimum, he suggests he should be permitted to obtain discovery regarding the Agents and to depose them prior to the Court addressing summary judgment.   ECF No. 57-2 ("Burch 56(d) Decl.") at ¶¶ 4-5.   The Government notes in its reply that it would not object to the Court allowing discovery into these matters.

SJ Order at 18-19.   Parties have since taken discovery on point, and now bring a highly similar motion that is no longer premature.[2]

///

///

---

[2] To clarify, parties may not actually have conducted the discovery to produce all the facts that they need.   See OACM at 18; RACO at 11 n.10, 17-23; Cross Reply at 5.   However, the Court has provided both direction that factual discovery is necessary and authorized such discovery to be taken.   Insofar as parties have nonetheless still failed to conduct discovery prior to filing these motions for summary judgment, it is to their own detriment.

**United States District Court**
For the Northern District of California

Based on the discovery permitted, conducted, and submitted for the Court's review, the Court considers as true additional facts.[3] However, the nature of these additional facts is limited by the additional evidence submitted by parties for the Court to review. This includes evidence submitted by both sides related generally to drug dogs and evidence primarily from the Government relating specifically to the Drug Dog Jackson.

As to the drug dogs generally, the Court factually finds that there may be some trace amount of drugs on many currency bills. See ECF No. 104-1 Ex. A.  However, even if this trace amount exists, the general methods of training drug dogs are not problematic.  See ECF No. 104-2 Ex. B; see also Harris, 133 S. Ct. at 1057-58; United States v. Gadson, 763 F.3d 1189, 1202 (9th Cir. Aug. 19, 2014) cert. denied sub nom. Wilson v. United States, 135 S. Ct. 2350 (2015) and cert. denied, 135 S. Ct. 2350 (2015).  The Court reviewed evidence about a dog being signaled by its trainer to alert.  See, e.g., ECF No. 104-1 Exs. C-D.  However, the Court reviewed other evidence to the contrary.  See ECF No. 114 Ex. 2. The Court finds that there is some possibility that the odor from drugs may remain on bills long after two hours.  See ECF No. 117 ("Woodford Decl."), ¶ 9.  It is also possible that the odor would remain longer if the bills were not shredded or were kept bundled together.  Id. ¶ 12.  However, just like whether handlers signaled

---

[3] Insofar as these findings contradict any of the Court's earlier findings of fact, these findings shall control.  Also, the Court notes each side has a motion for summary judgment pending, and the Court will be obligated to consider the facts in the light most favorable toward that one side.  Rather than list out two differing versions of the facts here, the Court will clarify in its analysis when an additional fact is being considered or otherwise changes to provide the proper beneficial light to the appropriate party.

1   their drug dogs, Claimant's information is disputed by Government

2   experts whose testimony seems no less likely to be viable than that

3   of Claimant's experts.  See ECF Nos. 112 ("Rose Decl.") ¶ 7, 114

4   ("Kenney Decl.) Ex. 3-7.  Thus the Court will continue its

5   consideration of these matters later in its discussion section

6   rather than here as accepted fact.

7        As to the drug dog Jackson specifically, the Court has

8   received only some of the information about his training.  Jackson

9   is a golden retriever who is regularly handled and trained by Task

10  Force Agent (TFA) O'Malley.  See ECF Nos. 38 ("O'Malley Decl."),

11  113 ("O'Malley Supp. Decl."), 136 at 3 ("O'Malley 2d Supp. Decl.");

12  see also ECF No. 37 ("Bondad Decl.") ¶ 17.  As part of their daily

13  routine, Jackson performs an off-leash search, at least twice every

14  day, of an area approximately 130 feet long by 15 feet wide at SFO.

15  O'Malley Supp. Decl. ¶¶ 3-5. Affidavits filed since permitting

16  discovery show that Jackson is regularly part of a certification

17  process that is accredited and standardized.  O'Malley Decl. ¶¶ 6-

18  7; O'Malley Supp. Decl. ¶ 1 (incorporating O'Malley Decl. by

19  reference); O'Malley 2d Supp. Decl. ¶ 3-4.  A copy of those

20  standards from the website was provided.  See ECF No. 127.  While

21  Jackson's specific training records were not provided, based on the

22  evidence before it and a dearth of evidence to the contrary, the

23  Court concludes as a factual matter, for the limited purposes of

24  this motion, that Jackson has been properly trained pursuant to

25  those programs.[4]

26       On the day of the seizure, September 27, 2013, after Claimant

27  was stopped and the Defendant currency seized, Special Agent (SA)

28

[4] This is subject to the Court's second additional ruling.

United States District Court
For the Northern District of California

**United States District Court**
For the Northern District of California

1  Leo A. Bondad hid Defendant inside a fire extinguisher box within

2  the area Jackson routinely searches.  Bondad Decl. ¶ 16; O'Malley

3  Supp. Decl. ¶ 6.  Neither Jackson nor TFA O'Malley were present

4  when the drugs were hidden nor did TFA O'Malley know how many

5  locations suspected drugs may have been placed (i.e., whether the

6  suspected drugs were together in a single bag or hidden in many

7  separate locations in multiple, separate bags).  When Jackson

8  ultimately found the drugs, he did so approximately 30 feet away

9  from TFA O'Malley, as part of an off-leash search where Jackson

10  systematically searched through an area without being directed or

11  in any way guided by his handler.  O'Malley Supp. Decl. ¶ 6.

12      Later that same day, the funds seized were deposited by the

13  Government into an account at Bank of America, and a cashier's

14  check was issued payable to the United States Marshalls.  ECF Nos.

15  51-1 ("Report of Investigation" or "ROI") at 6, Bondad Decl. ¶ 18.

16      Claimant disputes certain facts.  See ECF No. 57-1 ("Figueroa

17  Decl.").  Claimant asserts he earned all of Defendant currency

18  through his work savings or via inheritance rather than from drug

19  trafficking.  Id. ¶¶ 2-3; see also ECF No. 68-1 at 6:11-16.

20  Claimant asserts he went to New York to potentially invest the

21  money in a new restaurant with an unspecified "close friend" but

22  "the new venture did not come to fruition."  Figueroa Decl. ¶ 4.

23  Claimant states that his ambivalence about ownership of Defendant

24  currency was actually a reflection of his desire to assert his

25  right to remain silent rather than be "evasive."  Id. ¶ 5.

26  Claimant also explained any confusion regarding why it may seem he

27  initially asserted that only some small portion of the money was

28  his.  Id.  Finally, Claimant disavows all flights reflected in the

1  attachment to the Bondad Decl. Ex. C (listing flights allegedly

2  purchased and taken by Claimant).

3     The Court has previously reviewed the Figueroa Declaration and

4  other related facts in connection with its SJ Order at 5-7.  See,

5  e.g., ECF No. 18-2 (an earlier declaration by Claimant presenting

6  his recollection of the encounter on September 27, 2013).  The

7  Court has received very little new evidence in support of the facts

8  asserted in the Figueroa Declaration since it was filed on July 17,

9  2014 from a source other than Claimant.  Interrogatory responses

10  include a limited number of pay stubs, reflecting the alleged

11  source for less than $600 of Defendant currency ($209,815).  See

12  ECF No. 68-1 (interrogatory responses) at 15, 18.  Supplemental

13  interrogatories identified additional persons for whom Claimant

14  allegedly worked or who were familiar with said work, but did not

15  include further pay stubs or extrinsic evidence, and indicated

16  Claimant did not keep records.  See ECF No. 100 at 12-17.

17

18  **III.  LEGAL STANDARD**

19     **A.    Summary Judgment**

20     Entry of summary judgment is proper "if the movant shows that

21  there is no genuine dispute as to any material fact and the movant

22  is entitled to judgment as a matter of law."  Fed. R. Civ. P.

23  56(a).  Summary judgment should be granted if the evidence would

24  require a directed verdict for the moving party.  Anderson v.

25  Liberty Lobby, Inc., 477 U.S. 242, 251 (1986).  "A moving party

26  without the ultimate burden of persuasion at trial—- usually, but

27  not always, a defendant —- has both the initial burden of

28  production and the ultimate burden of persuasion on a motion for

**United States District Court**
For the Northern District of California

1    summary judgment." <u>Nissan Fire & Marine Ins. Co., Ltd. v. Fritz</u>

2    <u>Cos., Inc.</u>, 210 F.3d 1099, 1102 (9th Cir. 2000).

3        "In order to carry its burden of production, the moving party

4    must either produce evidence negating an essential element of the

5    nonmoving party's claim or defense or show that the nonmoving party

6    does not have enough evidence of an essential element to carry its

7    ultimate burden of persuasion at trial." <u>Id.</u>  "In order to carry

8    its ultimate burden of persuasion on the motion, the moving party

9    must persuade the court that there is no genuine issue of material

10   fact." <u>Id.</u>  "Where the nonmoving party bears the burden of proving

11   a claim, the moving party need only point out 'that there is an

12   absence of evidence to support the nonmoving party's case.'" <u>See</u>

13   <u>Devereaux v. Abbey</u>, 263 F.3d 1070, 1076 (9th Cir. 2001) (quoting

14   <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 325 (1986)).  "The evidence

15   of the nonmovant is to be believed, and all justifiable inferences

16   are to be drawn in his favor." <u>Anderson</u>, 477 U.S. at 255.

17      **B.   <u>Civil Forfeiture</u>**

18       Civil forfeiture may occur where the goods or currency seized

19   were "in exchange for a controlled substance or listed chemical in

20   violation of this subchapter, [including] all proceeds traceable to

21   such an exchange." 21 U.S.C. § 881.  The burden of proof for the

22   civil forfeiture of any property "if the Government's theory of

23   forfeiture is that the property was used to commit or facilitate

24   the commission of a criminal offense, or was involved in the

25   commission of a criminal offense, [is that] the Government shall

26   establish that there was a substantial connection between the

27   property and the offense." 18 U.S.C. § 983(c)(3).

28   ///

**United States District Court**
For the Northern District of California

To initiate the civil forfeiture action, there must have been probable cause to believe the forfeiture proper at the time the forfeiture was initiated.  United States v. $493,850.00 in U.S. Currency, 518 F.3d 1159, 1168-69 (9th Cir. 2008).  To help clarify this standard to parties, the Court quotes from the Ninth Circuit:

> The probable cause requirement is statutory.  Pursuant to 19 U.S.C. § 1615, which also assigns the burden of proof in forfeiture proceedings, the government must show that probable cause exists to institute its action.   We recently held that this requirement survived the enactment of the Civil Asset Forfeiture Reform Act of 2000.[5]  [$493,850.00], 518 F.3d at 1169.
>
> "The government has probable cause to institute a forfeiture action when it has reasonable grounds to believe that the property was related to an illegal drug transaction, supported by less than prima facie proof but more than mere suspicion."  Id. (internal quotation marks omitted).   Probable cause may be supported only by facts "untainted" by any prior illegality.  See United States v. Driver, 776 F.2d 807, 812 (9th Cir. 1985).  It may be based only upon information gathered before the forfeiture action was instituted.  [$493,850.00], 518 F.3d at 1169.

United States v. $186,416.00 in U.S. Currency, 590 F.3d 942, 949 (9th Cir. 2010).  Accordingly, the law requires proof by preponderance of the evidence that there was a "substantial connection" to drugs for proof of the underlying case at trial, but to get in the courthouse door the Government need only show it had probable cause for the action at the time the complaint was filed.

Probable cause may be proven by any evidence the Court chooses to admit in an evidentiary hearing so long as it is not tainted by a Fourth Amendment violation.  Id.  As parties seem unclear on this point, the Court again quotes from the Ninth Circuit:

> "Determination of probable cause for forfeiture is based upon a 'totality of the circumstances' or

---

[5] Commonly abbreviated as "CAFRA," the Act is Pub. L. No. 106-185 (2000), codified principally at 18 U.S.C. §§ 981-985.

'aggregate of facts' test." $129,727.00 U.S. Currency, 129 F.3d at 489. Accordingly, for the government to meet its burden, it must demonstrate that it had "reasonable grounds to believe that the [money] was related to an illegal drug transaction, supported by less than prima facie proof but more than mere suspicion." United States v. $22,474.00 in U.S. Currency, 246 F.3d 1212, 1215-16 (9th Cir. 2001) (alteration in original) (citation omitted). "To pass the point of mere suspicion and to reach probable cause, it is necessary to demonstrate by some credible evidence the probability that the money was in fact connected to drugs." United States v. $30,060.00 in United States Currency, 39 F.3d 1039, 1041 (9th Cir. 1994) (emphasis in original) (citation omitted). Credible hearsay or circumstantial evidence can be used to support probable cause. See United States v. 1982 Yukon Delta Houseboat, 774 F.2d 1432, 1434 (9th Cir. 1985); United States v. 22249 Dolorosa St., 190 F.3d 977, 983 (9th Cir.1999). We have held that "[e]vidence of a prior drug conviction is probative of probable cause" in drug trafficking cases. $22,474.00 in U.S. Currency, 246 F.3d at 1217.

United States v. Approximately $1.67 Million (US) in Cash, Stock & Other Valuable Assets Held by or at 1) Total Aviation Ldt., 513 F.3d 991, 999 (9th Cir. 2008). The Supreme Court has since further clarified that a "police officer has probable cause to conduct a search when the facts available to [him] would warrant a [person] of reasonable caution in the belief that contraband or evidence of a crime is present. . . . All we have required is the kind of fair probability on which reasonable and prudent [people,] not legal technicians, act." Harris, 133 S. Ct. at 1055 (citations omitted, alterations in original).

**C.    Drug Dogs and Related Expert Testimony**

The United States Supreme Court has considered the reliability of drug dogs and provided clear guidance on point:

[E]vidence of a dog's satisfactory performance in a certification or training program can itself provide sufficient reason to trust his alert. If a bona fide organization has certified a dog after testing his reliability in a controlled setting, a court can

10

> presume (subject to any conflicting evidence offered) that the dog's alert provides probable cause to search. The same is true, even in the absence of formal certification, if the dog has recently and successfully completed a training program that evaluated his proficiency in locating drugs. A defendant, however, must have an opportunity to challenge such evidence of a dog's reliability, whether by cross-examining the testifying officer or by introducing his own fact or expert witnesses. The defendant, for example, may contest the adequacy of a certification or training program, perhaps asserting that its standards are too lax or its methods faulty. . . . And even assuming a dog is generally reliable, circumstances surrounding a particular alert may undermine the case for probable cause—if, say, the officer cued the dog (consciously or not), or if the team was working under unfamiliar conditions. . . . If the State has produced proof from controlled settings that a dog performs reliably in detecting drugs, and the defendant has not contested that showing, then the court should find probable cause. If, in contrast, the defendant has challenged the State's case (by disputing the reliability of the dog overall or of a particular alert), then the court should weigh the competing evidence. . . . The question--similar to every inquiry into probable cause--is whether all the facts surrounding a dog's alert, viewed through the lens of common sense, would make a reasonably prudent person think that a search would reveal contraband or evidence of a crime. A sniff is up to snuff when it meets that test.

_Harris_, 133 S. Ct. at 1057-58.

Both Government and Claimant cite and could be read to request review of expert testimony related to the drug dog in this case under the standards of _Daubert v. Merrell Dow Pharmaceuticals, Inc._, 509 U.S. 579 (1993). Per _Daubert_ and in spite of the Court's earlier citation to _Celotex_, normally, the proponent has the burden to prove admissibility of a proffered testimony even on summary judgment where a defendant need not other produce evidence. _Lust By & Through Lust v. Merrell Dow Pharm., Inc._, 89 F.3d 594, 597 (9th Cir. 1996). However, per the Supreme Court and Ninth Circuit,

///

11

dog sniffs do not necessarily trigger the expert disclosure requirements of Federal Rule of Criminal Procedure 16 or require the district court to conduct a reliability inquiry under <u>Daubert</u> [citation omitted]. <u>See Florida v. Harris</u>, ––– U.S. ––––, 133 S.Ct. 1050, 1057–58 (2013) (rejecting any requirement for a detailed checklist of proof of reliability or special procedures for dog sniffs in probable cause hearings); <u>Illinois v. Caballes</u>, 543 U.S. 405, 409 (2005) (discussing trial courts' general ability to assess the reliability of dog sniffs).

<u>United States v. Herrera-Osornio</u>, 521 F. App'x 582, 586 (9th Cir. 2013) (internal parallel citations omitted).

## IV.   <u>DISCUSSION</u>

Claimant argues that the Government must prove it had probable cause for forfeiture at the time it filed its complaint. The claimant, applying Fed. R. Civ. P. 56, argues that the Government fails to show that there was probable cause that Defendant currency was substantially connected to illegal drug sales. <u>See</u> 21 U.S.C. § 881(A)(6); 18 U.S.C. § 983(c)(3). Claimant argues evidence of a "drug courier profile" is insufficient, challenges the totality of the circumstances, and argues against the use of drug dogs (citing pre-<u>Harris</u> cases). <u>See</u> Mot. at 9-13. The Claimant later disputes the facts (and admissibility thereof) as set forth by the Government, requests the Court not consider any drug dog evidence as a spoliation sanction, and argues that even absent such a sanction the facts and circumstances do not connect the Defendant currency to drug sales. <u>See generally</u> RACO. Finally, Claimant attempts to rebut the Government's expert and reasserts its spoliation argument.

The Government argues that it had probable cause to bring this action, citing both law and facts to support that a totality of

**United States District Court**
For the Northern District of California

1  circumstances are in its favor.  <u>See</u> OACM at 5-20.  The Government

2  later argues Claimant's expert testimony is inadmissible, asserts

3  Claimant failed to take discovery, and attempts to answer

4  challenges to its burden and totality of the circumstances

5  arguments.  <u>See generally</u> Cross Reply.  Finally, the Government

6  rebuts objections to its own experts and reiterates why it believes

7  spoliation sanctions are not appropriate.  <u>See generally</u> Response.

8      In considering the motions for summary judgment and cross-

9  motion for summary judgment, the Court first begins with the

10  applicable burden.  The Court will next consider the spoliation

11  issue.  Based on the Court's findings with respect to those

12  threshold-like matters, the Court will then review the totality of

13  the circumstances.

14      **A.**  **Burden of Proof**

15      The Court clarifies several matters with respect to the proper

16  burden.  First, parties seem to take some time to agree on

17  precisely the summary judgment standard as applied to civil

18  forfeiture.  The proper standard is set out at length in the

19  Court's law section.  Second, the parties disagree as to the degree

20  to which probable cause is the applicable standard, and when this

21  standard must be met.  The proper standard for the case as a whole

22  is preponderance of the evidence that Defendant was substantially

23  connected to drug sales, but the proper standard for this motion is

24  whether there was probable cause to find a connection between

25  Defendant currency and drug trafficking at the time the complaint

26  was filed.  This in turn requires the Court to consider the

27  totality of the circumstances.  Finally, the parties disagree

28  whether only admissible evidence may be used in proving probable

cause.  The Court will not consider evidence obtained in violation of the Fourth Amendment, but as this is a probable cause determination the Court may and will consider other evidence (such as hearsay) which may not normally be admissible.  The Court also notes that even were it to limit itself to admissible evidence, the Court would provide parties a chance to cure any simple deficiency, making it highly likely that the Government would produce affidavits from the proper federal agents involved with this case. The Court also notes that "a dog's alert that meets such requirements [i.e., makes a reasonably prudent person think that a search would reveal contraband or evidence of a crime] is also sufficiently reliable to be admissible under Rule 702." Gadson, 763 F.3d at 1202-03.

**B.    Spoliation**

A district court has the inherent power to levy sanctions for spoliation of evidence.  Leon v. IDX Sys. Corp., 464 F.3d 951, 958 (9th Cir. 2006); Tetsuo Akaosugi v. Benihana Nat. Corp., No. C 11-01272 WHA, 2012 WL 929672, at *3 (N.D. Cal. Mar. 19, 2012).  The party requesting sanctions bears the burden of proving, by a preponderance of the evidence, that spoliation took place.  Akiona v. United States, 938 F.2d 158 (9th Cir. 1991).  A court must find that the offending party had notice that the spoliated evidence was potentially relevant to the litigation before imposing sanctions. Leon, 464 F.3d at 959.  There is no spoliation "when, without notice of the evidence's potential relevance, [a party] destroys the evidence according to its policy or in the normal course of its business." United States v. $40,955.00 in U.S. Currency, 554 F.3d 752, 758 (9th Cir. 2009), cert. denied, 558 U.S. 895 (2009).

**United States District Court**
For the Northern District of California

1    The Complaint in this case was originally filed in February of

2  2014.  ECF No. 1 ("Compl.").  The Government seized the Defendant

3  currency on September 27, 2013.  ECF No. 124 ("Rashid Decl."), ¶ 5.

4  The seizure occurred at approximately 12:33 p.m., and the funds

5  were deposited into an account at Bank of America approximately one

6  hour later at 1:30 p.m. the same day.  Compl. ¶¶ 15, 18; RACO at 6

7  (citing ECF No. 51-1 at 6).  Claimant filed an administrative claim

8  67 days later, on December 2, 2013.  Compl. at 5.  No party

9  disputes these factual claims.

10    Therefore, the Court looks to the regular policy of the

11  Government in depositing the bills with the Bank of America.  The

12  policies appear to be from the Department of Justice (DOJ) and the

13  Drug Enforcement Agency.  The DOJ's policy per the Attorney General

14  requires that "seized cash, except where it is to be used as

15  evidence, is to be deposited promptly . . . pending forfeiture" and

16  must be transferred to the United States Marshall "within sixty

17  (60) days of seizure or ten (10) days of indictment."  Rashid Decl.

18  ¶ 2.  Exceptions may only be granted by the Director of the

19  Executive Office for Asset Forfeiture for "extraordinary

20  circumstances."  Id. (emphasis in original).  The Asset Forfeiture

21  Policy Manual, with respect to the above policy, requires "all cash

22  seized for purposes of forfeiture . . . must be delivered to the

23  USMS for deposit in the USMS Seized Asset Fund either within 60

24  days after the seizure or 10 days after indictment, whichever

25  occurs first."  Id. ¶ 3.  While "[p]hotographs and videotapes of

26  the seized cash should be taken for later use in court as evidence"

27  the policy does not require saving any of the currency for testing.

28  Id.  The DEA's policy is even more stringent, requiring that

currency "seized for forfeiture and not retained as evidence" by
the Government must be deposited with a financial institution
"within five business days" of being seized.   Rashid Decl. Ex. A
(excerpting the DEA Agent Manual).   Moreover, the same DEA Policy
requires that cash in excess of $5,000 can only be kept for
evidentiary purposes upon high-up authorization within DOJ, namely
the Chief, DOJ/AFMLS.   Id.

There is no dispute that the Government complied with its
policy insofar as it was required to deposit Defendant currency in
a timely fashion.   The question is rather whether the Government,
in its haste to respect its need for a timely deposit, failed to
comply with its policy insofar as the policy contemplates keeping
currency which is to be used as evidence.   Claimant urges that the
Government was on notice that the bills were potentially relevant
to the litigation before the bills were destroyed.   Surreply at 5
(citing Leon, 464 at 959 (9th Cir. 2006)).   Claimant immediately
thereafter cites $40,955, 554 F.3d 758 (9th Cir. 2009), but fails
to note that $40,955 is a civil forfeiture case decided after Leon
and that $40,955 expressly finds that destruction of bills was not
grounds for spoliation sanctions.   There, in another case involving
seizure of bills believed to be used in connection with drugs,
claimant told police at the time of the search that the currency
seized was his and that he earned it long ago.   $40,955, 554 F.3d
at 758.   Yet this did not constitute notice to police to keep the
money or preserve the serial numbers.   Id.   As claimant did not
expressly request the bills be preserved until nearly a year after
the search and the "marginal relevance" of the currency, the panel
upheld that no spoliation sanction was necessary.   Id. at 758-59.

United States District Court
For the Northern District of California

**United States District Court**
For the Northern District of California

Here, the facts are similar to $40,955 in that there was not sufficient notice to the Government that the bills were to be used as evidence.  Claimant did not assert the money was his until (at earliest) 67 days after the forfeiture, beyond the 60 day window of the Attorney General and well beyond the five business day window of the DEA.  So far as the Court is aware, there was no discussion of lab testing the bills themselves until Claimant raised his spoliation claims, 21 months after the seizure.  There may be an argument for spoliation where a Claimant notifies the Government of its desire to test bills seized -- or at least proceed to trial in a case related to such seizure -- within the 60 day window of the DOJ's policy.  Thus the DEA assumes a certain amount of risk that it will destroy evidence that it needed to preserve when it acts too hastily.  But such a case is not presently before the Court. Here, even if the Government's disposal prior to a full 60 days was error, the error is harmless because by the end of those 60 days there was still no indication by the Claimant that he would seek recovery of the Defendant currency.  C.f. id.

The Court is not persuaded by Claimant's citation to non-mandatory authorities which have imposed a spoliation sanction based on the law in other circuits.  See RACO at 6, 140 Ex. at 1 n. 1.  Unlike in U.S. v. $100,120.00, No. 1:03-cv-03644 (N.D. Ill. Feb. 11, 2015), ECF No. 116-1, here the Government did not seek to rely on a need to generate interest on the money.  Rather, it presented a reasonable justification linked to a need to control a very large amount of cash seized.  See Rashid Decl. ¶¶ 8-9.  Over $7.3 million in cash was seized in the 2014 fiscal year just at SFO, and from 2003 to date over $114 million in cash has been

**United States District Court**
For the Northern District of California

seized in 3,576 actions by the DEA's San Francisco Division alone.
Id. ¶ 9.  In that time, the Government only cites two cash seizures
retained as evidence, and both were never processed and the cash
was returned to claimants.  Id.  Even were the Defendant currency
in this case not four full evidence bags worth of bills and thus
difficult to securely store, the DEA's record underscores the
reasonable need of the Government to have a clear policy in place
with few exceptions to safely store and manage such a large
quantity of cash.  As the Government has provided the Court a
rational basis for the chosen policy, the Court declines to set the
policy aside on the facts of this case.  See 5 U.S.C. § 706(2)(A).

In further support of its denial of sanctions, the Court notes
the unlikelihood that any evidence could be attained from the bills
at the time Claimant first indicated an express desire to test the
bills, which was 21 months after the seizure.  Even had Claimant
expressed desire to test the bills the day he noticed the DEA he
would seek recovery of the seized currency, 67 days would still
have passed.  The expert testimony before the Court in this motion
debates the length of time an odor could remain on a bill.  The
competing expert for each side suggests radically differing timing
-- the Government's expert suggests approximately 1.5 hours for the
odor to dissipate, whereas Claimant's expert suggests many hours,
days, weeks, maybe even years could pass before the odor would be
undetectable.  Compare ECF No. 125 ¶¶ 9-10 with Woodford Decl. ¶ 9.
Yet even assuming that Claimant's expert is admissible and
scientifically reliable,[6] 67 days is on the higher end of

---

[6] This assumption is made strictly for the limited purposes of this
discussion.  The Court will discuss the admissibility and
reliability of these experts later.

1   Claimant's expert's assertions for how long a residual odor may
2   linger, 21 months is on the highest end of that same timetable, and
3   insofar as any odor did linger for that time, more of it would have
4   dissipated.  See ECF No. 125 ¶¶ 9-10; Woodford Decl. ¶ 9.

5        Moreover, the Court is not clear what type of testing would be
6   likely to provide Claimant reliable, relevant results.  For
7   example, it is unlikely that a comparison test -- comparing the
8   residual odor on the Defendant bills to other bills whose history
9   was known -- would provide any reliable, relevant results.  This is
10  so because there is no evidence as to the specific nature or
11  quantity of drug(s) near which the Defendant bills were placed.
12  Therefore, there is no basis for comparison of "clean" bills or
13  bills intentionally placed near certain quantities and types of
14  drugs for set lengths of time to the results (if any) that may have
15  been obtained from Defendant currency had it been preserved.  Thus
16  the likelihood of Claimant to have actually gotten the evidence he
17  seeks when he first sought such evidence (at 67 days or 21 months)
18  is substantially lower than was the case in $40,955.  There, the
19  serial numbers would certainly have remained on the bills, yet the
20  Ninth Circuit still found no spoliation sanction appropriate due to
21  Claimant's lack of notice.  How much more so is no sanction
22  appropriate here, where the evidence sought might reasonably not
23  even be possible to attain or use in a manner helpful to Claimant
24  had the bills been kept.

25       Accordingly, the Court DENIES the spoliation sanction
26  requested by Claimant to suppress evidence of the dog sniff and its
27  results.  The Court FINDS the destruction of the bills in this case
28  to have been proper at best, harmless error at worst.

**United States District Court**
For the Northern District of California

## C.   **Totality of the Circumstances**

In light of the Court's rulings above, the Court now turns to its evaluation of the totality of the circumstances.  The Court will consider the drug profile, the expert analysis, and the evidence relating to drug dogs -- both drug dogs generally and the drug dog Jackson specifically -- before finally balancing all the involved circumstances to draw its final conclusions.

### 1.   **Drug Profile**

The Court can and does accept evidence that Claimant fit a "drug profile" to help determine whether there was probable cause to believe the Defendant currency was involved in drug trafficking. In doing so, the Court recognizes that a drug profile alone is not necessarily dispositive.  See United States v. Dimas, 532 F. App'x 746, 748 (9th Cir. 2013) ("[G]overnment agents or similar persons may testify as to the general practices of criminals to establish the defendants' modus operandi.") (citations omitted); United States v. Ortiz-Hernandez, 427 F.3d 567, 573 (9th Cir. 2005); United States v. $22,474.00 in U.S. Currency, 246 F.3d 1212, 1216 (9th Cir. 2001) ("While drug courier profiling alone is insufficient to establish probable cause, courts have used it as a factor in considering the totality of the circumstances.) (citing United States v. $129,727, 129 F.3d 486, 491 (9th Cir. 1997)); United States v. $49,576.00 U.S. Currency, 116 F.3d 425, 427-28 (9th Cir. 1997).[7]  Moreover, not all portions of the profile here

---

[7] The Court limits it reliance on $49,576.00, cited by Claimant, see Mot. at 10, as it is unclear whether the case remains good law. Claimant urges the Court to accept that "[i]n the Fourth Amendment context, however, a drug courier profile can, at most, provide grounds for reasonable suspicion; it cannot establish probable cause. . . . the fact that appellant's actions matched a drug courier profile cannot establish probable cause to justify

**United States District Court**
For the Northern District of California

1   are dispositive.  For example, even though Claimant traveled from a

2   city known as a place to purchase drugs to a city known as a

3   location to sell drugs, that alone is not dispositive.  See Bondad

4   Decl. ¶ 21; RACO at 19; United States v. Currency, U.S. $42,500.00,

5   283 F.3d 977, 981-82 (9th Cir. 2002) (certain facts alone, such as

6   cross-country travel without hotel reservations, does not create

7   probable cause); but see $22,474, 242 F.3d 1212, 1216 (9th Cir.

8   2001) (considering one-way, same day travel purchased with cash as

9   a relevant factor).  The question is whether the facts on balance

10  favor a finding of probable cause.

11      To help answer this question, the Court notes that the facts

12  of this case are highly reminiscent of United States v. $132,245.00

13  in U.S. Currency, 764 F.3d 1055, 1058-59 (9th Cir. Aug. 21, 2014).

14  There, a panel affirmed a district court's finding that seized

15  currency was probably connected to drug trafficking.  Id.  In so

16  concluding, the panel found that "a large amount of cash is strong

17  evidence that the money was furnished or intended to be furnished

18  in return for drugs," and that a drug detection dog's alert to a

19  large sum of money is "strong evidence" of "a connection to drug

20  trafficking."  Id. (citations omitted).  There claimant gave

21  inconsistent statements about the origin of the money, was highly

22  nervous, and when ultimately arrested was found to have a text

23  message on his phone discussing the transfer of the money.

24

25

26  forfeiture."  $49,576.00, 116 F.3d at 427-28.  However, $49,576.00
    was decided before CAFRA, and expressly refused to credit dog
27  sniffs due to widespread contamination of currency, rulings
    contrary to Harris.  Id.  Moreover, the facts involved a Claimant
28  who was charged with but never convicted of a drug crime, vice here
    where Claimant who was convicted -- albeit some while ago.

**United States District Court**
For the Northern District of California

Here, the Court has almost identical facts except it lacks any text message.  The amount of money in this case is almost double that of $132,245.00, so clearly must be a sufficiently large amount of cash to reach the threshold of "strong evidence that the money was furnished or intended to be furnished in return for drugs." Id.  See also $42,500.00, 283 F.3d 981-82 (citing $93,685.61 in U.S. Currency, 730 F.2d 571, 572 (9th Cir. 1984)); but see $191,910 in U.S. Currency, 16 F.3d at 1072 (probable cause cannot be established by a large amount of money standing alone).  Moreover, a drug dog alerted to the large sum of Defendant currency, again providing a strong link to drug trafficking.  C.f. $132,245.00, 764 F.3d at 1058-59 (decided after Harris).[8]

Also here, similar to $132,245.00, Claimant gave ultimately inconsistent statements about the origin of the money (he initially was at best unclear as to who owned the money) and appeared nervous during the encounter.  Compare generally Figueroa Decl. with Bondad Decl.  In $132,245.00, the affidavits of Claimant and his friends were rejected because they came almost a full year after the government seized the money and lacked "even the most basic details."  764 F.3d at 1058-59.  While the evidence was not negligible, it was not sufficient to persuade the appellate court's panel that the district court had erred.  In a similar manner, the Court here finds that the affidavit of Claimant submitted almost 10 months after the seizure is not negligible but is not sufficiently credible to cause the Court to reject the far more likely

///

///

---

[8] The Court will discuss the admissibility of the drug dog below.

United States District Court
For the Northern District of California

explanation that the money was not from inheritance and largely

undocumented, unverified work but rather connected to drug sales.[9]

   In reviewing the totality of circumstances, the Court

expressly considers that the evidence before it may suffer from the

concern that the evidence points to some criminal activity in

general but fails to expressly connect to drug trafficking. See

116 F.3d 425, 428.  In many similar cases, there is some extra

factor to draw this connection.  See, e.g., $132,245.00 (text

messages indicated identity and timing of transfer of the money,

whereas here no such text was produced); $42,500.00 (money was

wrapped in cellophane to prevent the scent from being detected by

dogs, whereas here it was merely wrapped in plastic); United States

v. $79,010 in U.S. Currency, 550 F. App'x 462 (9th Cir. 2013)

(collecting cases with distinctive features).  This is not to say

there are no indicia of drug trafficking here.  For example, there

is a prior drug arrest in this case, albeit quite old.  See ROI at

7 (Claimant was arrested in March of 2000 for Marijuana Possession

and Drug Equipment Possession); but see $49,576.00, 116 F.3d at

427-28 (being previously detained but not charged was not enough of

a link to drug trafficking); see also United States v. $22,474.00

in U.S. Currency, 246 F.3d 1212, 1216-17 (9th Cir. 2001)

(claimant's conflicting statements and inability to answer simple

questions supported an inference that the money was drug-related,

and a prior conviction for drug trafficking provided the necessary

link between the incriminating circumstances and illegal drugs).

However, evidence from the drug dog resolves any concern connecting

---

[9] This finding is limited to the Court's probable cause
determination as required for this motion.

1  Defendant currency to drug trafficking.  Therefore, the Court turns

2  now to the expert opinions and drug dog evidence.

3      **2.**   **Experts**

4      Parties seem to ask the Court to apply <u>Daubert</u> standards to

5  testimony by allegedly "expert" witnesses.  The Court declines.

6  <u>See</u> <u>Herrera-Osornio</u>, 521 F. App'x at 586 ("dog sniffs do not

7  necessarily . . . require the district court to conduct a

8  reliability inquiry under <u>Daubert</u> [citation omitted]").  The Court

9  is satisfied that the experts put forward by parties provide

10  information helpful for the Court's consideration and that their

11  knowledge is beyond that of an ordinary person, and so finds their

12  opinions admissible in the limited context of this motion to the

13  limited degree they offer information that is not preempted by the

14  rulings of mandatory authority (<u>e.g.</u>, <u>Harris</u>).  That said, the

15  Court will consider lack of field experience, inconsistencies, and

16  other detrimental factors pointed out by parties in weighing the

17  likelihood of any assertion made by any purported expert put

18  forward by any party.

19      **3.**   **Drug Dogs**

20      The Defendant has provided little or no evidence to "dispute

21  the reliability of the dog overall or of [the] particular alert" by

22  Jackson.  <u>See</u> <u>Harris</u>, 133 S. Ct. at 1058.  The evidence from the

23  Government (affidavits by TFA O'Malley describing Jackson's

24  training) is not ideal but is nonetheless sufficient for now to

25  satisfy the Court that Jackson was properly trained in a

26  certification program.  <u>See</u> O'Malley Decl. ¶¶ 4-7; O'Malley Supp.

27  Decl. ¶¶ 3-5; O'Malley 2d Supp. Decl ¶¶ 3-4.  Moreover, the program

28  appears to have parameters that are sufficiently standardized to be

United States District Court
For the Northern District of California

encompassed within the mandatory authority of <u>Harris</u>.  <u>See</u> ECF No.
127 Ex. A.  "[E]vidence of a dog's satisfactory performance in a
certification or training program can itself provide sufficient
reason to trust his alert." <u>Harris</u>, 133 S. Ct. at 1057.  Moreover,
that Jackson is known to not alert to residue on currency in
general circulation is a significant factor weighing in favor of
crediting his sniff.  <u>See</u> O'Malley 2d. Supp. Decl. ¶¶ 3-4; RACO at
18; <u>$132,245.00</u>, 764 F.3d at 1058-59 (9th Cir. 2014).  Therefore,
the Court has both sufficient and significant reason to find in
favor of the Government.  Insofar as Claimant submits evidence that
drug dogs are generally unreliable, <u>Harris</u> considered this issue
and has already made a binding, contrary determination.[10]  The
Court holds accordingly and rejects Claimant's arguments.

Where the Government's evidence does fail to entirely resolve
the issue is whether Jackson was signaled.  "[E]ven assuming a dog
is generally reliable, circumstances surrounding a particular alert
may undermine the case for probable cause—if, say, the officer cued
the dog (consciously or not), or if the team was working under
unfamiliar conditions.  <u>Id.</u> at 1057.  Here, Jackson and TFA
O'Malley were working under familiar circumstances, Jackson had
conducted the entire search of the familiar area while off leash,
and Jackson was approximately 30 feet away from his handler when
Jackson alerted.  <u>See</u> O'Malley Supp Decl. ¶¶ 4-6.

The procedural posture drives some difference, but it is not
dispositive.  In the light most favorable to the Government

_____

[10] The literature in the evidence submitted by Claimant is largely
from before <u>Harris</u>.  Insofar as points made therein were considered
and rejected by the Supreme Court in <u>Harris</u>, the Court will not
here reconsider what the Supreme Court has already decided.

**United States District Court**
For the Northern District of California

1   (required when considering Claimant's motion for summary judgment),

2   the facts are clear that there was no signaling by the handler from

3   30 feet away.  Thus, as "the [Government] has produced proof from

4   controlled settings that a dog performs reliably in detecting

5   drugs, and the [Claimant] has not contested that showing, [] the

6   court should find probable cause."  <u>Harris</u>, 133 S. Ct. at 1058.

7   The Court therefore finds probable cause, and Claimants' summary

8   judgment motion fails.

9          However, in the light most favorable to Claimant (required

10  when considering the Government's cross-motion for summary

11  judgment), it may be possible that a handler can unconsciously

12  signal his dog when the dog first directed to search or by a motion

13  at a distance.  While experts can debate the likelihoods based upon

14  whatever approved methodology they happen to use,[11] their

15  discussion will be targeted at a factual question, namely: was

16  Jackson signaled in this specific case?  The determination here is

17  thus ultimately a factual question whose result is highly material

18  -- if not outright dispositive -- to the value of the otherwise

19  reliable dog sniff.  In the current procedural posture and with the

20  limited current evidence (the dearth of which the Court will

21  discuss below), the Court cannot negate either the possibility that

22  Jackson was or that he was not signaled by operation of law.

23  Therefore, this is a matter properly decided by a trier of fact at

24  ///

25  ///

---

26  [11] Parties have not filed <u>Daubert</u> motions or motions to strike,

27  though their motions seem to desire that the Court take up such an
    analysis.  The Court declines, and will address such motions only

28  if necessary in the wake of this Order, in light of <u>Herrera-
    Osornio</u>, 521 F. App'x at 586.

1    trial.  Accordingly, because the Government's cross-motion contains

2    a dispute over a genuine issue of material fact, it, too, fails.[12]

3              **4.   Balancing**

4         Given the totality of the circumstances and the Court's

5    findings with respect to drug dogs, a preponderance of the evidence

6    supports a finding that there was probable cause for the seizure if

7    the drug dog evidence can be used.  Given the shifting light of the

8    summary judgment motions,[13] this question resolves against each

9    moving party in turn due to the clear evidence or lack thereof as

10   to the ability of a handler to signal a dog upon release or at a

11   distance.  Therefore, both Claimant's motion for summary judgment

12   and the Government's cross-motion for summary judgment are DENIED.

13             **5.   Additional Rulings**

14        The Court now makes two additional rulings, one on discovery

15   in general and one on discovery on a specific issue.

16        The Court earlier noted that parties were permitted to seek

17   discovery but may not have completed discovery prior to filing this

18   motion.  See OACM at 18; RACO at 11 n.10, 17-23; Cross Reply at 5.

19   The Court previously made clear that discovery was necessary on

20   certain matters for this case to go forward.  Claimant chose to

21   file a motion for summary judgment without having taken that

22   discovery, but then rushes to point out the need for discovery in

23   reply to the Government's cross-motion.  The Court is not impressed

24   [12] Even if the Court were inclined to grant summary judgment for
25   the Government, it would not do so prior to completion of discovery
     or resolution of the Court's second "additional ruling" below.
26   [13] A similar shifting of burdens may or may not be relevant to
     disputed facts about the origin of the Defendant currency, meaning
27   of Claimant's responses, or flights Claimant previously did or did
     not take.  However, the Court need not reach this issue, as the
28   Supreme Court has made it clear that the Court satisfies the
     totality of the circumstances test upon a reliable drug dog sniff.

United States District Court
For the Northern District of California

**United States District Court**
For the Northern District of California

1   with this tactic, and continuing in this manner is likely to

2   needlessly lengthen this litigation.  Therefore, decisions herein

3   are deemed to be made WITH PREJUDICE.  Said another way, parties

4   are expressly DENIED permission to refile for summary judgment on

5   any ground considered within this motion except as permitted by the

6   Court -- either herein or by a separate order issued upon a proper

7   administrative motion by either party justifying the exception.

8        The Court earlier stated that the Government's evidence

9   regarding Jackson's training is "not ideal" but is "sufficient for

10   now to satisfy the Court that Jackson was properly trained."  The

11   term "for now" references this second additional ruling.

12        The Court has been given no indication whether the Government

13   has produced unredacted training records for Jackson.  These

14   records are required for a proper determination of probable cause.

15   See United States v. Salazar, 598 F. App'x 490, 491-92 (9th Cir.

16   Jan. 16, 2015) ("The district court also lacked the benefit of

17   United States v. Thomas, 726 F.3d 1086, 1096-97 (9th Cir. 2013),

18   cert. denied, --- U.S. ----, 134 S.Ct. 2154 (2014), where this

19   court concluded that redacted canine training records were

20   inadequate to demonstrate a canine's reliability for a probable

21   cause finding to justify a subsequent search.").

22        Admittedly, this is a civil proceeding rather than a criminal

23   proceeding, and thus the due process rights of a Claimant are less

24   than those of a criminal defendant.  However, the Ninth Circuit has

25   found that the probable cause remains the standard even after the

26   passage of the Civil Asset Forfeiture Reform Act. See $186,416.00,

27   590 F.3d at 949; see also Cross Reply at 17-18.  Therefore, as

28   probable cause is a test primarily understood within a criminal

**United States District Court**
For the Northern District of California

1   context and the core of this case revolves around suspected

2   criminal activity, the Court finds that here the requirement of

3   <u>Thomas</u> applies.

4       The Court therefore ORDERS the Government to provide Claimant

5   an unredacted copy of Jackson's training records within ten (10)

6   days of the date of this Order, and to simultaneously provide a

7   copy of said discovery to the Court (as, per <u>Salazar</u>, the Court may

8   have an independent duty to review these records).  Claimant is

9   granted leave to file for reconsideration within forty (40) days of

10   the date of this Order on the <u>strict</u> condition that such a motion

11   is limited to challenges of the training records so produced.  The

12   Court ORDERS Claimant to file a notice with the Court if it decides

13   at any earlier point that it will not file such a motion.

14       Leave for Claimant to file for reconsideration provided herein

15   is immediately voided if the Government shows the Court that the

16   Government provided an unredacted copy of Jackson's training

17   records to Claimant prior to the submission of Claimant's Combined

18   Reply (ECF No. 116).  This caveat protects the Government if

19   Claimant has already had an opportunity to bring the type of

20   challenge <u>Thomas</u> seeks to provide and tactically chose to waive it.

21

22   **V.**   **CONCLUSION**

23       Claimant's motion and the Government's cross-motion for

24   summary judgment are both DENIED.  Unredacted records of Jackson's

25   training must be provided to Claimant and the Court within 10 days

26   of this order, and leave is hereby granted to file a motion for

27   reconsideration on the strictly limited basis thereof may be

28   requested within 40 days of the date of this Order.  This leave to

1  file for reconsideration is void if the Government shows it

2  previously provided said records prior to the filing of ECF No 116.

3

4      IT IS SO ORDERED.

5

6      Dated: October 14, 2015      

7                                  United States District Judge